## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **WYANDOTTE NATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-2656-JAR-DJW** |
| | ) | |
| **KENNETH L. SALAZAR, in his official** | ) | |
| **capacity as Secretary of the United States** | ) | |
| **Department of the Interior,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF KANSAS, ex rel.** | ) | |
| **DEREK SCHMIDT, Attorney General,** | ) | |
| | ) | |
| **Intervening Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff Wyandotte Nation, a federally recognized Indian tribe ("the Nation"), filed this

lawsuit against Kenneth Salazar, Secretary of the United States Department of the Interior ("the

Secretary"), seeking an order from this Court compelling the Secretary to accept title to certain

land and hold it in trust for the Nation's benefit, as specifically required by Public Law 98-602,

98 Stat. 3149 (1984) ("P.L. 98-602"), under both the Administrative Procedure Act ("APA"), 5

U.S.C. § 706(a) and the Mandamus Act, 28 U.S.C. § 1361.  The State of Kansas ("the State")

was permitted to intervene as of right under Fed. R. Civ. P. 24(a).[1]  This matter is before the

Court on the Nation's Motion for Summary Judgment (Doc. 60) and the Secretary and State's

cross-motions for summary judgment (Docs. 66, 69).  The Court heard oral arguments on March

_____

[1]Doc. 41.  The State's counterclaims and cross-claims were previously dismissed. Doc. 56.

14, 2013, at which time the Secretary was directed to supplement the Administrative Record and the matter was taken under advisement. For the reasons explained in detail below, the Court denies the Nation's motion and grants in part and denies in part the Secretary and the State's cross- motions, retaining jurisdiction over the case until the agency issues a final decision on the Nation's pending land-into-trust application.

## I.     Statutory and Regulatory Background

### A.     Land-Into-Trust Statutes Generally

If authorized by an act of Congress, the Secretary of the Interior may hold title to land in trust for the benefit of an Indian tribe.[2] Generally, such trust acquisition statutes fall into one of two categories. "Discretionary" acquisitions are those for which Congress has delegated to the Secretary the determination of whether the acquisition is appropriate under the circumstances.[3] The most common discretionary acquisition statute is the Indian Reorganization Act of 1934.[4] Department of the Interior regulations set forth factors the Secretary is to consider in exercising his discretionary authority to acquire land in trust.[5] In contrast, "mandatory acquisitions" are those for which Congress has directed the acquisition of land into trust, often identifying a specific parcel or certain eligibility requirements for the land.[6]

When the acquisition statute is "mandatory," most of the regulatory factors applicable to

---

[2] *See* 25 C.F.R. §§ 151.3, 151.9.

[3] *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1261 (10th Cir. 2001).

[4] *See* 25 U.S.C. § 465.

[5] *See* 25 C.F.R. § 151.10 (on-reservation acquisitions); § 151.11 (off-reservation acquisitions).

[6] *See Sac & Fox Nation*, 240 F.3d at 1261.

discretionary acquisitions do not apply.[7]  For example, the notice and comment provisions

requiring that the Department notify state and local governments of the fee-to-trust application

are not applicable,[8] and compliance with the National Environmental Policy Act[9] is not required.

Although not required to consider the factors listed in Department regulations, the Secretary still

interprets the regulations as requiring public notice of a decision to acquire land in trust,[10] and

internal Department guidelines require the Secretary to conduct a contaminant survey on the

lands.  While the Department of Interior's Assistant Secretary for Indian Affairs has generally

delegated decision-making authority for fee-to-trust applications to the Department's regional

offices, the Assistant Secretary has not delegated that authority with respect to applications that

seek to have the United States accept land in trust for gaming purposes.[11]

### B.      Public Law 98-602

Congress passed Public Law 98-602 in 1984.[12]  The acquisition statute is mandatory, and

> provid[ed] for the appropriation and distribution of money in
> satisfaction of judgments awarded to the Wyandottes by the Indian
> Claims Commission and the Court of Claims.  The judgments were
> compensation for lands in Ohio that the Wyandottes had ceded to
> the United States in the 1800s.  Under the 1984 law, Congress
> directed that 20% of the allocated funds be used and distributed in
> accordance with a series of directives.  Key among those directives
> . . . was one providing that a sum of $100,000 of such funds shall
> be used for the purchase of real property which shall be held in

---

[7]*See* 25 C.F.R. §§ 151.10, 151.11.

[8]25 C.F.R. §§ 151.10, 151.11(d).

[9]42 U.S.C. § 4332.

[10]25 C.F.R. § 151.12(b).

[11]*See* AR000555.

[12]*See* 98 Stat. 3149 (1984).

trust by the Secretary for the benefit of such Tribe.[13]

The statute states, in relevant part,

> (b) Twenty percent of the funds allocated to the Wyandotte Tribe of Oklahoma pursuant to section 103(b) shall be used and distributed in accordance with the following general plan:
>
>> (1) A sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe. . . . [14]

## II.    Undisputed Material Facts

Because the Nation's suit involves claims under the APA, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."[15]  "As all material facts are within the administrative record, no material issues of fact are in dispute."[16]  The record review principle applies with equal force to claims of undue delay brought under 5 U.S.C. § 706(1), as in this case.[17]  Because the Secretary has yet to make a final decision on the Nation's application, the parties have filed motions for summary judgment to address the merits.  Judicial review of the Nation's Complaint, however, is still limited to the agency record lodged by the Secretary.[18]  Accordingly, the Court does not consider the two extra-record affidavits attached to the Nation's

---

[13]*Sac & Fox Nation*, 240 F.3d at 1255 (footnote and internal quotations omitted).

[14]Pub. L. No. 98-602, § 105, 98 Stat. at 3151.

[15]*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

[16]*LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 215 F. Supp. 2d 73, 84 n.5 (D.D.C. 2002).

[17]*See Sierra Club v. U.S. Dept. of Energy*, 26 F. Supp. 2d 1268, 1272 (D. Colo. 1998).

[18]*Id*. at 1272.

4

motion for summary judgment, as they are not included in the Administrative Record lodged by the Secretary.[19]

In November 1992, the Nation purchased approximately 10.5 acres of land near Park City, Kansas ("Park City Land") with $25,000 withdrawn from its main investment account.[20] Park City is located north of Wichita along U.S. Interstate Highway 135.[21]

On January 21, 1993, the Nation submitted an application requesting the Department of the Interior (the "Department") take the Park City Land into trust for the nation pursuant to Public Law 98-602.[22] On February 19, 1993, the Tulsa Field Solicitor's office sent a memorandum to the Director of the Muskogee Area Office stating that Public Law 98-602 did not impose a mandatory duty on the Secretary to take the Park City Land into trust and that the monies awarded to the Nation under Public Law 98-602 were not in settlement of a land claim.[23] The memorandum notes that, at the time, the Nation had agreed to pursue the application under the Secretary's discretionary authority, making the question relating to Public Law 98-602 "moot."[24]

---

[19]Doc. 61, Exs. 1, 2. *See Sierra Club*, 26 F. Supp. 2d at 1272; *Citizens for Alts. to Radioactive Dumping v. U.S. Dep't Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (discussing exceptions to record review principle). The Secretary also objected to consideration of the three exhibits submitted by the State in support of its cross-motion for summary judgment. Doc. 68, Exs. A-C. Those exhibits are now part of the Administrative Record, as supplemented on March 25, 2013. *See* AR004058-4171.

[20]AR001581-82. The Park City Land is also referred to as the "Coliseum Center Property" in certain parts of the Administrative Record. *See, e.g.*, AR001173.

[21]AR000792.

[22]AR0088-172.

[23]AR000991-1002.

[24]AR000992.

In December 1995, due to the Solicitor's opinion, the Nation withdrew its request to have the Park City Land taken into trust, electing instead to have property in Kansas City, Kansas (the "Shriner Tract") taken into trust under the mandatory provisions of Public Law 98-602.[25]  As discussed further below, the Department ultimately accepted in trust for the Nation the Shriner Tract.[26]  That decision and the Nation's planned use for the land were subject to more than a decade of litigation in this Court and in the United States Court of Appeals for the Tenth Circuit.[27]

On April 13, 2006, the Nation filed an application with the Bureau of Indian Affairs Eastern Oklahoma Region to accept the Park City Land in trust for the benefit of the Wyandotte Nation.[28]  The Nation intends to use the Park City Land to operate a casino.[29]  In its 2006 application, the Nation requested that the Park City Land be accepted in trust under discretionary authority granted to the Secretary of the Interior by the Indian Reorganization Act., 25 U.S.C. § 465.[30]

In May 2008, the Nation wrote the Department's Regional Director and took the position that the Park City Land was purchased with Public Law 98-602 funds, and argued that the Department could accept the Park City Land in trust under the authority of Public Law 98-602.[31]

---

[25]AR002252; AR002291-2295.

[26]AR001774.

[27]AR001772-76.  *See* Doc. 6-1 for a summary of the litigation surrounding the Shriner Tract.

[28]AR001179-80.

[29]AR001182-83; AR000082-86.

[30]AR001179; AR001182-83.

[31]AR001369-74.

The Nation explained that, while it did not agree with the 1993 Solicitor's opinion, it "determined that its best legal course to take in vindicating its rights granted under Pub. L. 98-602 would be available on land in Kansas City, Kansas."[32] The Nation explained that because it prevailed on legal disputes involving the Shriner Tract that indirectly resolved the Park City Land purchase, it determined it was appropriate to re-apply for the placement of the land into trust under Public Law 98-602.[33] The Nation followed the May 2, 2008 letter with a "Supplement to Application for the Secretary of the Interior/BIA Muskogee Region to take Land Located in Park City, Kansas In Trust for the Wyandotte Nation and to Determine Such Trust Lands May Be Used for Gaming Purposes."[34]

On January 30, 2009, after completing its initial review of the Nation's Park City Land application, the Eastern Oklahoma Region forwarded the application and a regional recommendation to the Department of the Interior's Central Office in Washington, D.C.[35] Specifically, the Muskogee Area Office transmitted the trust application to the Department with a cover letter stating, "[t]he Region's evaluation of the request and supporting documents reveals that *P.L. 98-602* authorizes the mandatory acquisition of the purported property for the Nation. Based upon the above findings, the Region has determined that the acquisition should be approved as a mandatory acquisition pursuant to *P.L. 98-602*."[36]

---

[32]AR001371.

[33]*Id*.

[34]AR000964-1026. The date of submission does not appear from the face of the document in the record.

[35]AR001173-77.

[36]AR000943-947 (emphasis in original).

Within a few months, Department staff in the Central Office had begun their review and on June 23, 2009, identified two issues surrounding the question of whether the Nation had used funds allocated to the Tribe in Public Law 98-602 to purchase the Park City Land.[37] The first issue involved a discrepancy in the date on which the Nation purchased the land and the source of funds; the second involved a discrepancy in the purchase amount.[38] Central Office staff met with the Nation in July 2009 to discuss these issues, including why the $25,000 used for the purchase of the land was apparently withdrawn more than one year prior to its purchase, and the Nation submitted additional information on August 18, 2009.[39] Based upon that information, the Nation explained that the land had not been purchased with the $25,000 redeemed in November **1991**, but rather had been purchased using $25,000 of Public Law 98-602 funds on November 24, **1992**.[40] As a result, Department staff believed the two issues had been resolved.[41]

Thereafter, Department staff worked to finalize a recommendation to agency decision-makers on the application.[42] The record contains numerous emails and memoranda between staff documenting the deliberative process as it passed through the so-called chain of command on its way to the official holding ultimate decision-making authority.[43] By late October 2010, the application was ready for final review and decision-making by the Assistant Secretary for Indian

---

[37]AR001564.

[38]*Id*.

[39]AR001581-88.

[40]*Id*. (emphasis added).

[41]AR001605.

[42]*See, e.g.*, AR001620; AR001669; AR001705; AR001721; AR001769; AR001843.

[43]*See, e.g.*, Doc. 61 at 7-22.

Affairs, Larry Echo-Hawk.[44]

In the interim, former Kansas Senator Bob Dole wrote to the Secretary on August 24, 2010, requesting a meeting to discuss the pending Park City Land application on behalf of his client, Peninsula Gaming,[45] which operates the Kansas Star Casino in Mulvane, Kansas. Kansas Attorney General Steve Six sent a September 13, 2010, letter to the Department identifying several concerns the State had now that the Nation's application was made under Public Law 98-602, rather than the Indian Reorganization Act.[46] The State presented what it viewed as several statutory obstacles to acquiring the land under Public Law 98-602.[47] The State explained that the letter was to supplement its previous 2008 objection to the Park City Land fee-to-trust application, which was premised on its understanding that the application was a discretionary one.[48] The State objected to the application under Public Law 98-602 on the grounds that the record and prior legal proceedings indicate that the mandatory provisions of that law were fully satisfied when the Nation purchased the Shriner Tract for significantly more than $100,000 and the Secretary took that land into trust for the Nation's benefit.[49] Included with the letter was additional analysis and supporting documentation from the administrative record and related legal proceedings.[50] The meeting arranged by Senator Dole was held September 16, 2010, with

---

[44]AR002154-55; AR002164.

[45]AR001872, 002582.

[46]AR001960-2133.

[47]AR001964-65.

[48]AR001960-61.

[49]*Id*.

[50]AR001964-2132.

representatives from the Department, the State, the Kansas congressional delegation, Peninsula Gaming and the Senator's staff in attendance.[51]

Upon receipt of the State's September 13 letter, the Department's Central Office undertook an initial review of the State's concerns.[52]  After a meeting held October 29, 2010 with the "Kansas folks" to discuss the issues, the Department decided on November 3, 2010, to assess the States' legal interpretations in more detail before making a final decision on the Nation's application.[53]

On November 15, 2010, Attorney General Steve Six sent a letter to the Secretary in response to Solicitor Thomas's request for further briefing and documentation from Peninsula Gaming's and Kansas interests.[54]  The State attached legal analysis and supporting exhibits prepared by Mark Gunnison, attorney for Peninsula Gaming, which the State had reviewed and with which it concurred.[55]  Highly summarized, the State took the position that when the Nation purchased the Shriner Tract, it spent more than could realistically be attributed to Public Law 98-602's principal $100,000 set aside funds plus interest; regardless of when the Park City Land was purchased, when the Shriner Tract was taken into trust the Nation knew and understood that the mandate of Public Law 98-602 was satisfied at that time, and that any further acquisitions had to be accomplished under some other authority.[56]

---

[51]AR002582.

[52]AR002142-43; AR002144.

[53]AR002167; AR002168; AR002400.

[54]AR002218-19.

[55]AR002220-2385.

[56]*Id.*

On December 14, 2010, the Department met with the Nation to discuss the State's concerns, and provided the Nation with the State's November letter; although the State also showed the Nation the two volumes of supporting documents submitted by the State, the Nation was not provided copies at that time.[57] As requested, the Nation then provided a written response to the State's letter on December 22, 2010.[58] The Nation took the position that in reviewing the State's letter, it was clear that the supporting documents were the same documents the Kansas opponents have circulated over the last fifteen years in "unsuccessful opposition to the Wyandotte Nation presence in Kansas," and the State's "arguments should again be summarily discarded."[59] Contrary to the State's arguments, the Nation asserted that the Park City Land and the Shriner Tract were purchased from the same Public Law 98-602 funds, as the additional funds used to purchase the Shriner Tract included interest earned on the original $100,000.[60]

The Department then revisited its analysis of whether Public Law 98-602 could provide the authority for the Park City Land fee-to-trust acquisition, again delaying the final decision.[61] On March 3, 2011, Kansas Attorney General Derek Schmidt sent a letter to the Secretary to express the State's continued opposition to the Nation's pending land-into-trust application in Park City, for the reasons previously set forth by Attorney General Six in November 2010.[62]

Dissatisfied with the amount of time the Department was taking to review the application,

---

[57] AR002419.

[58] AR002418-24.

[59] *Id.*

[60] AR002420-2424.

[61] AR002437; AR002502; AR002619; AR002650; AR002759.

[62] AR002439-2459.

the Nation filed this suit on July 26, 2011, claiming the Secretary has unreasonably delayed an allegedly mandatory duty to accept title and hold the Park City Land in trust for the Nation's benefit.[63]  The Nation asks the Court to direct the Secretary to "immediately accept trust title to the Park City Land and hold it in trust for the benefit of the [Wyandotte]."[64]  The Secretary declined Senator Dole's request for another meeting.[65]

The Department completed its renewed legal analysis near the end of 2011, and the application was again nearing decision in early 2012.[66]  On February 14, 2012, Department staff briefed the Department of Interior Solicitor on their analyses and recommendation.[67]  On February 16, 2012, the State sent another letter to the Department, pointing out what it viewed to be an expenditure of Public Law 98-602 funds that it had just learned of after review of the Administrative Record in this litigation.[68]  The letter stated that the Attorney General wished to bring two documents to the Secretary's attention: a December 22, 2010 letter from the Nations' counsel David McCollough to David Moran, with the Office of the Solicitor; and McCollough's letter of August 18, 2009, to Candace Beck, with the Office of the Solicitor.[69]  Specifically, the State notes that in August 2009, the Nation corrected more than a decade of alleged

---

[63]Doc. 1.

[64]*Id.*

[65]AR002580.

[66]AR002794; AR003384.  The record indicates that a draft decision letter was being circulated; copies of the drafts have been fully redacted.

[67]AR003407, AR003678.

[68]AR004022-25.

[69]*Id.*

misinformation about the source of funds used to purchase the Park City Land.[70]  For many years, the Nation had maintained that the land was bought with money withdrawn in November 1991 from a segregated account that housed only the mortgage investment bonds that the Nation purchased with the $100,000 set aside by Public Law 98-602 for the purchase of land.[71]  In August 2009, however, the Nation disclosed that the Park City Land was actually purchased in November 1992, and that the cash used to buy the property came from cash withdrawn at that time from a commingled general investment account.[72]  According to the State, that fact, if accurate, would undermine previous efforts to account for expenditures of Public Law 98-602 funds.  Because of this commingling, the cash used to purchase the Park City Land cannot be traced to those funds, and as a result, determination of whether the money withdrawn in November 1992 was Public Law 98-602 funds becomes a matter of attribution—if the $25,000 used to purchase the Park City Land is deducted from the calculation of the accrued interest and earnings on the principal 98-602 funds starting in November 1992, there would not have been enough money in July 2006 to account for the $180,000 attributed to the purchase of the Shriner Tract.[73]  The Department forwarded the State's letter to the Nation.[74]

In response to the State's letter, the Department initiated yet a further review of the funds' expenditures, which included consultation with the Department's Office of Financial

---

[70]*Id.*

[71]*Id.*

[72]*Id.*

[73]*Id.*

[74]AR004056.

Management.[75]  By letter dated March 29, 2012, the Department notified the Nation of receipt of the State's February 16 letter; that same date, the Department acknowledged receipt of the State's letter and stated it was "reviewing the issues raised in the letter and will consider them as part of the Nation's application."[76]

On September 20, 2012, Mark Gunnison, who was appointed Special Assistant Attorney General for the State in connection with this matter, sent the Secretary a letter following up on Attorney General Schmidt's February 16 letter.  Gunnison included a report prepared by Jerry Gottlieb, CPA, who was engaged by the State to review the account statements submitted by the Nation to the Secretary in 2001.[77]  Gottleib concluded that the entirety of the $25,000 withdrawn from the Nation's investment account in November 1992 cannot be attributed to the Public Law 98-602 funds and still have $180,000 available in 98-602 funds in July 1996 with which to fund the Shriner Tract purchase.[78]  In other words, there were not enough 98-602 funds to fund both the $180,000 purchase of the Shriner Tract in July 1996, and also the purchase of the Park City Land in November 1992.[79]  Accordingly, the State contends that Gottleib's report provides an independent basis upon which to reject the Nation's application to have the Park City Land placed in trust on a mandatory basis under P.L. 98-602, because the land cannot have been purchased entirely with P.L. 98-602 funds given the history of the Shriner Tract acquisition.[80]  A

---

[75]AR003890; AR003951; AR004008.

[76]AR004057.

[77]*Id*.

[78]AR004070.

[79]*Id*.

[80]AR004061.

corrected report reaching the same conclusion was submitted by the State on October 24, 2012.[81]

The Assistant Secretary of the Interior met with representatives of the Nation to discuss the Park City Land application in November 2012.[82]  Representatives of the State met with the Assistant Secretary of Indian Affairs on March 20, 2013.[83]  The Secretary's review of the Nation's application remains on-going.

## III.    Standard of Review

The Nation seeks to compel agency action under both the APA, 5 U.S.C. § 706(1) and the Mandamus Act, 28 U.S.C. § 1361.  "The availability of a remedy under the APA technically precludes [the Nation's] alternative request for a writ of mandamus."[84]  The available remedy under both statutes, however, is essentially the same—a mandatory injunction.[85]

Judicial review under the APA is based upon "the whole record or those parts of it cited by a party."[86]  The United States Supreme Court has explained, "the focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court."[87]  Thus, even though judicial review rests with a

---

[81]AR004110-4171 (correcting pagination and collating errors in September 2012 Gottleib report).

[82]AR004230.

[83]AR004174.

[84]*Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167, 1170 (10th Cir. 1997) (citing *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993)).

[85]*Id.*; *see Norton v. S. Utah Wilderness Assoc. ("SUWA")*, 542 U.S. 55, 63-64 (2004).

[86]5 U.S.C. § 706.

[87]*Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *accord Fla. Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985).

district court, the district court does not act as a fact-finder.[88]  Instead, "[t]he task of the reviewing court is to apply the appropriate APA standard of review . . . based on the record the agency presents . . . ."[89]

The APA grants a reviewing court the authority to "compel agency action unlawfully withheld . . ."[90]  But a court can only compel an agency "to perform a ministerial or non-discretionary act" that the agency is legally required to take.[91]  Further, relief in the nature of mandamus is an extraordinary remedy, appropriate in "only . . . the clearest and most compelling cases."[92]

> The courts have achieved this limitation in part through a narrow definition of the term "duty."  According to traditional doctrine, a writ of mandamus will issue "only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined.  The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable."[93]

The APA also requires that federal agencies conclude matters presented to them "within a reasonable time."[94]  Section 706(1) of the APA grants a reviewing court the authority to "compel

---

[88]*See Fla. Power & Light*, 470 U.S. at 744; *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

[89]*Id*. at 743-44 (citing *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402 (1971)).

[90]5 U.S.C. § 706(1).

[91]*See SUWA*, 542 U.S. at 64.

[92]*13th Reg'l Corp. v. U.S. Dept. of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (citation and quotations omitted).

[93]*Id*. (citations omitted).

[94]5 U.S.C. § 555(b).

agency action . . . unreasonably delayed."[95]  Where the form of action itself is not legally

mandated, a court may only order the agency to take action, without directing how the agency

will act.[96]  The issue of unreasonable delay "cannot be decided in the abstract, by reference to

some number of months or years beyond which agency inaction is presumed to be unlawful."[97]

"The ultimate issue . . . [is] whether the time the [agency] is taking to act . . . satisfies the 'rule of

reason.'"[98]

## IV.    Discussion

The Nation's Complaint presents three issues.  First, whether the Secretary has a clear,

non-discretionary duty to accept the Park City Land in trust under Public Law 98-602.  Second,

whether the Secretary's failure to act in the face of this clear obligation amounts to an

unreasonable delay of agency action.  And, finally, whether the Secretary has violated the

Department's fiduciary obligations to the Nation.

### A.    Duty to Act

Because the APA precludes the Nation's alternative request for a writ of madamus, the

Court will analyze its request under § 706(1) of the APA, which "empowers a court only to

compel an agency 'to perform a ministerial or non-discretionary act' or 'to take action upon a

matter, without directing *how* it shall act.'"[99]  In this case, the Nation's Complaint seeks an order

---

[95] 5 U.S.C. § 706(1).

[96] *See SUWA*, 542 U.S. at 63.

[97] *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).

[98] *Id*.

[99] *SUWA*, 542 U.S. at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)) (emphasis in the original).

compelling the Secretary to accept the land in trust under § 706(1) of the APA.[100]   In order to obtain such relief, the Nation must establish that (1) the Secretary owes it a clear duty; (2) the duty is mandatory, rather than discretionary; and (3) the right to relief is clear.[101]   The Nation cannot make this showing.

The Nation contends that since 2008, the Secretary has "consistently and steadfastly" recognized that the Park City Land is a "mandatory acquisition" under Public Law 98-602, and thus, the Department's duty to act on the Park City land is mandatory.   The Court agrees with the Secretary that the Nation, in effect, conflates the Department's categorization of Public Law 98-602 as a "mandatory" acquisition statute with a determination that 98-602 funds were used to purchase the Park City Land.   As the Tenth Circuit made clear, the mandatory obligation under Public Law 98-602 is invoked only if the land in question was purchased with Public Law 98-602 funds.[102]   As the court explained, a determination that acquisition of land in trust is mandated necessitates an inquiry of whether that land was purchased with Public Law 98-602 funds.[103]   The Department's use of the phrase "mandatory" when referring to the Nation's application does not appear to represent a conclusion on the application but rather, as a means to distinguish between land-into-trust applications made under Public Law 98-602 and "discretionary" applications

---

[100]In its briefs in support of summary judgment, however, the Nation also argues that it is entitled to a decision on its application.  That issue is raised in the context of whether the Secretary has failed to act upon the Nation's application within a reasonable time, as required by APA § 555(b).  Accordingly, the Court will consider the Nation's request as posed in the alternative.

[101]*Rios v. Aguirre*, 276 F. Supp. 2d 1195, 1199 (D. Kan. 2003) (citation omitted); *see SUWA*, 542 U.S. at 64 (explaining a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take); *Rios v. Ziglar*, 398 F.3d 1201, 1208 (10th Cir. 2005) (noting that the right to the writ must be "clear and undisputable") (citation omitted).

[102]*Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1268 (10th Cir. 2001).

[103]*Id*. at 1263-64.

made under the Indian Reorganization Act.

Moreover, the Nation's arguments and requested relief are premised on the assumption that the Secretary has already determined that the Nation purchased the Park City Land with Public Law 98-602 funds. It is undisputed that the Assistant Secretary for Indian Affairs holds the Secretary's delegated authority to decide the Nation's application.[104] Many of the documents cited by the Nation are discussions among Department legal staff or exchanges of a redacted draft memorandum in late 2009. The Nation also focuses on the packets prepared for the Assistant Secretary's review and signature, in 2010 and 2012, which the Nation argues can only mean Department staff had determined Park City was purchased with 98-602 funds. The record is clear, however, that even if prior formal recommendations to take the land in trust were prepared by Department staff, a final determination has yet to be made by the Assistant Secretary on the issue of whether Public Law 98-602 mandates that the department accept the Park City Land into trust. Thus, Public Law 98-602 does not create a clear, undisputed duty that would allow the relief the Nation seeks.

Furthermore, as the Secretary notes, the Nation ignores the practical implications of what they ask this Court to compel. After making a decision to accept land in trust for a tribe's benefit, Department regulations require the Secretary to provide a public notice period prior to actual title transfer, with opportunity for aggrieved parties to challenge the land-into-trust decision.[105] If the Court compels the Secretary to accept the Park City Land in trust, it is unclear

---

[104] *See* AR000555; 209 Dep't Manual 8 (April 21, 2003), *available at* http://elips.doi.gov/ELIPS/DocView.aspx?id=802.

[105] *See* 25 C.F.R. § 151.12(b).

how the agency could be determined to have acted arbitrarily and capriciously or contrary to law in taking that action. In other words, the Nation's requested relief places the factual question of whether the Nation purchased the Park City Land with 98-602 funds before the Court rather than the Secretary, which is outside the scope of judicial authority under the APA.[106] Accordingly, summary judgment is granted in favor of the Secretary with respect to the Nation's claims that the Secretary unlawfully withheld its duty to accept the Park City Land in trust, as set forth in Counts I and II.

### B. Unreasonable Dely

The Court turns to the pace of the processing and whether there has been an unreasonable delay justifying this Court to compel the Department to take action on the Nation's pending application. Section 706(1) also authorizes courts to compel agency action "unreasonably delayed." Because Public Law 98-602 does not include a deadline for agency action, the Nation does not dispute that the Secretary's decision-making timeline is governed by the APA's requirement that federal agencies conclude matters presented to them "within a reasonable time."[107] "[I]f an angency has no concrete deadline establishing a date by which it must act, and is instead governed only by general timing provisions . . . a court must compel only action that is delayed unreasonably."[108] Under those circumstances, the Tenth Circuit has made clear that

---

[106] *See Norton v. Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004) (where "the manner of [the agency's] action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be").

[107] 5 U.S.C. § 555(b).

[108] *Forest Guardian v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). "Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully witheld agency action and courts, upon proper application, must compel the agency to act." *Id.*

Section 706(1) of the APA "leaves the courts the discretion to decide whether agency delay is unreasonable."[109]

A mandatory injunction is a drastic remedy that should be reserved for the most extraordinary circumstances.[110] In considering a claim of unreasonable delay, a court must satisfy itself "that the agency has a clear duty to act and that it has 'unreasonably delayed' in discharging that duty."[111] The Tenth Circuit has recognized four factors that a court may consider to assess whether a delay warrants judicial intervention: (1) the length of time that has elapsed since the agency came under a duty to act; (2) the reasonableness of the delay in the context of the statute authorizing the agency to act; (3) the consequences resulting from the time that has passed; and (4) "the practical difficulty in carrying out the legislative mandate, or need to prioritize in the face of limited resources."[112] This inquiry is ultimately governed by a "rule of reason," which accounts for the difficulty and complexity of the issue, problems beyond the agency's control, an agency's need to prioritize its own resources, and administrative error.[113] The time being taken for agency review should not amount to a "breakdown of regulatory processes."[114]

---

[109]*Id.* at 1191 n.18.

[110]*See In re Copper Tire & Rubber Co.*, 568 F.3d 1180, 1186 (10th Cir. 2009) (discussing in the context of requiring a district court to act).

[111]*In re Am. Rivers & Id. Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004).

[112]*Kim v. U.S. Citizenship & Immigration Servs.*, 551 F. Supp. 2d 1258, 1265 (D. Colo. 2008) (citing *Qwest Comm. Intern., Inc. v. F.C.C.*, 398 F.3d 1222, 1239 (10th Cir. 2005)); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149-50 (D.C. Cir. 1992).

[113]*Cutler v. Hayes*, 818 F.2d 879, 898-99 (D.C. Cir. 1987).

[114]*Id.* at 897 n. 156.

*Extent of Delay*

The Nation contends that its application has been under consideration for nearly seven years, or since it was submitted in April 2006. This argument ignores the fact that the original application cited the Indian Reorganization Act as providing the Secretary's discretionary authority to acquire the Park City Land in trust. The Nation did not amend its application to proceed under Public Law 98-602 until May 2008. This is significant for two reasons. First, the 2008 application required a determination of whether the Nation used Public Law 98-602 funds to acquire the Park City Land—a determination the Indian Reorganization Act does not require. Second, the State did not have reason to submit its comments sooner than September 2010, as it believed the Department was considering the application under the discretionary authority in the Indian Reorganization Act. Thus, the Nation's application under 98-602 has been pending for approximately five years.

As discussed in detail below, the Secretary asserts that the Nation's application is being reassessed in light of the State's objections that were not raised until February 2012. The Secretary has not, however, asserted that there is any timetable by which they intend to adjudicate the Nation's application. This indefinite and protracted delay tips this factor in the Nation's favor.

*Reasonableness of the Delay in the Context of the Legislation Authorizing Agency Action*

The Nation contends that Public Law 98-602 gives the Secretary no discretion to take the land in trust, requiring only that the Park City Land was purchased with Public Law 98-602 funds. Although the Nation stops short of alleging impropriety in the processing of its application, it implies that the State's objections and consequential delay by the Secretary are

politically motivated.  The Secretary correctly points out, however, that the Nation once again relies on the faulty assumption that the Secretary has determined that issue.  The Secretary further counters that the rule of reason demonstrates that the Department's ongoing review is not the type of egregious delay that would warrant an order compelling it to act.  Rather than a breakdown of regulatory process, as alleged by the Nation, the Secretary argues that the Department's review reflects a legitimate effort to adequately assess the factual and legal validity of the Nation's application, which is particularly appropriate given the years of litigation surrounding the Shriner Tract.

The Secretary's position is well taken.  The record shows that, contrary to the Nation's claims, the Secretary has made efforts to both move the application forward and assess and respond to the concerns of those in opposition.  As the Secretary notes, the funds question is the keystone of the Secretary's authority to acquire the land in trust under Public Law 98-602.  As the parties and this Court are well-aware, the Secretary's approval of the Nation's related Shriner Tract acquisition under Public Law 98-602 resulted in more than a decade of litigation.  Like this case, the Shriner Tract litigation focused on whether the Nation used Public Law 98-602 funds to purchase the property, and resulted in the courts twice remanding the funds question back to the Secretary for reconsideration.[115]  Here, the Department has twice decided to reevaluate the application based on concerns the State raised, first with respect to the legal interpretation of Public Law 98-602 and second, with respect to what the State contends is a previously-unknown expenditure of funds.  After this latest issue was raised in February 2012, the Department took

---

[115] *See Sac & Fox Nation*, 240 F.3d at 1263-64; *Governor of the State of Kan. v. Norton*, No. 03-4140-JAR, 2005 WL 1785275 at **2,4 (D. Kan. July 27, 2005).

23

steps to involve its Office of Financial Management, and in September and October 2012, the

State submitted a detailed accounting report raising new issues for concern that are much broader

than the initial question regarding the year the $25,000 was withdrawn to purchase the Park City

Land.  Based on the State's submissions, the Secretary determined that reassessment of the

Nation's application is justified.  The Secretary has recently met with representatives of both the

Nation and the State, and the investigation is active and ongoing.  Under these circumstances, the

Court finds this factor weighs in the Secretary's favor.

### *Consequences of the Delay*

The Nation claims that the delay in review time has resulted in a competitive

disadvantage compared to other casinos, and a delay in the potential revenues that the casino

could afford the Nation.  The Secretary counters that while the opportunity for economic

development presents a possible solution to tribal social welfare issues, this case does not present

a harm to human health and welfare, distinguishing it from other cases in which courts have

required agency action to occur within a specific time frame.[116]  Accordingly, this factor appears

to be neutral.

### *Administrative Difficulties Bearing on the Agency's Ability to Resolve an Issue*

The Secretary asserts that the Nation is requesting, in effect, that the Department make

the Nation's application its top priority, which may result in a commensurate lengthening of the

review process for actions requested by other tribes facing social and economic needs.  The

---

[116]*See, e.g., In re Int'l Chem Workers Union*, 958 F.2d at 1150 (explaining that the serious heath risks associated with cadmium exposure warranted setting a deadline for finalizing new requirements for handling cadmium); *Families for Freedom v. Napolitano*, 625 F. Supp. 2d 535 (S.D.N.Y. 2009) (involving regulations to curtail abuse at immigration detention facilities); *Pub. Citizens Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21(D.C. Cir. 1984) (involving regulations to avoid Reye's syndrome and death in children).

Secretary notes that the Assistant Secretary is responsible for all Indian affairs for the 560 tribes, not merely this case or even land-into-trust applications. Answering the funding question posed by the State also requires some level of accounting forensics, which takes time and resources. The Nation counters that its application was previously on a list of cases ready for decision,[117] and the State's arguments do not justify its losing its priority position. Courts have noted the importance of "competing priorities" for limited resources in assessing the reasonableness of administrative delay.[118] There is no evidence here that the Department has treated the Nation differently from other tribes or that Department staff working on the application are just "twiddling their thumbs."[119] Because the problem seems to stem from a lack of resources, this factor also weighs in favor of the Secretary.

### Conclusion and Remedy

The Court recognizes that, on its face, a delay of nearly five years in processing the Nation's land-into-trust application appears unduly long and works a potential economic hardship on the Nation and its members. The Court further acknowledges the Nation's frustration with two eleventh-hour objections from the State at a point in the process where it appears its application was being finalized for the Assistant Secretary's review. Rather than a breakdown of the regulatory process, however, the Court agrees that the Secretary's decision to reassess its review of the application reflects a legitimate effort to adequately address the factual

---

[117]See AR001722-23 (in March 2010, Park City Land was included on list of pending applications "ready to go within 90 days"; AR002772 (in December 2010, Park City Land was included on a list of "Pending Gaming Applications Near Final Decision").

[118]See Mashpee Wampanoag Triabal Council, Inc. v. Norton, 336 F.3d 1094, 1100-01(D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)).

[119]Id.

and legal validity of the Nation's application and the State's detailed and specific accounting and fund allocation concerns. This is particularly appropriate given the protracted history of these proceedings and the related Shriner Tract. Moreover, the Nation has not helped to move the process along by summarily responding to the State's concerns by taking the position that the issues raised by the State were already decided by the Secretary early in the process. Thus, after careful consideration of the factors cited by the Tenth Circuit, the Court concludes that mandamus relief is not warranted.

The Court turns to whether it should, in its discretion, retain jurisdiction over this case to ensure that the Secretary continues to make progress toward resolution of the pending application.[120] The Secretary has assured the Court and the Nation that it is diligently attempting to expeditiously process the Park City Land application. While the Court concludes that the Secretary's actions do not amount to unreasonable delay warranting issuance of an order compelling agency action, it is concerned by the length of time the application process has taken. Although the Secretary contends that the Department has undertaken the analysis required to "figure out" the accounting snarls raised by the State, it has not provided the Court with any timetable or projected dates for resolving the matter. It has been over a year since the State raised its accounting concerns with the Secretary, and nearly six months since the State supplemented those concerns with a detailed report prepared by CPA Gottlieb. The Nation is entitled to a final decision on its application, and to assure that the Secretary proceeds with

---

[120]*See Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120-21 (D. D.C. 2005) (citing *Telecommc'ns Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (recognizing that, even where mandamus is not appropriate, a court may retain jurisdiction to obtain information regarding the anticipated dates of administrative action and remain informed of the agency's progress); *Orion Reserves Ltd. P'ship v. Kempthorne*, 516 F. Supp. 2d 8, 16 (D. D.C. 2007) (same); *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102 (same).

diligence and any further delay does not drift into the realm of unreasonableness, this Court will retain jurisdiction over this case until the Secretary issues a final ruling on the Nation's application.

Accordingly, the Secretary shall provide the Nation and the Court with quarterly status reports detailing the progress the Department has made in processing the Nation's Park City Land application. The first report shall be due **ninety (90) days** after the date of this Order and shall include a detailed description of all significant actions undertaken processing the Nation's application since the date of this Order; subsequent quarterly reports shall include the progress undertaken since the preceding report. In addition, the Secretary shall provide a schedule of actions expected to be undertaken during the next and subsequent three month period. Upon reasonable request by the Nation or the Court, the Secretary shall provide within thirty (30) days any additional information to explain or supplement its quarterly reports. If the Nation is unable to obtain additional information from the Secretary, it may petition the Court to order the Secretary to provide such information. Finally, at any time prior to the issuance of the final ruling, any party may petition this Court for any additional relief as may be warranted.

### C. Fiduciary Duty

The Nation contends that the Secretary owes the Tribe more than the bare minimum of administrative regularity required by the APA. The Nation argues that the Secretary has a general duty to deal fairly with Indians,[121] and a specific fiduciary duty under Public Law 98-602. Because the Secretary is acting as a trustee, the Nation urges that his actions "must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more

---

[121]*Morton v. Ruiz*, 415 U.S. 199, 236 (1974).

stringent standards demanded of a fiduciary."[122] The Nation contends that the Secretary's treatment of its land-into-trust application fails to satisfy these standards.

As the Park City Land is not held in trust by the United States, there is no "control or supervision over tribal monies or properties" from which "the fiduciary relationship normally exists with respect to those monies or properties."[123] "The federal government . . . incurs specific fiduciary duties toward particular Indian tribes when it manages or operates Indian lands or resources. The elements of this type of common law trust are a trustee (the United States), a beneficiary . . . and a trust corpus (the regulated Indian property lands or funds)."[124] In this case, the essential element of a trust corpus is missing.[125] In addition, the Court's conclusion that the Secretary's actions do not constitute unreasonable delay precludes any finding of malfeasance. Accordingly, the Nation has not stated a claim for breach of fiduciary duty, and Count III is dismissed.

**IT IS THEREFORE ORDERED BY THE COURT** that the Wyandotte Nation's Motion for Summary Judgment (Doc. 60) is DENIED; the Secretary of the Interior's Cross-Motion for Summary Judgment (Doc. 66), and Intervenor State of Kansas's Cross-Motion for Summary Judgment (Doc. 69) are GRANTED in part and DENIED in part; Defendants' Cross-Motions for Summary Judgment are granted with respect to Counts I and III, and the claim in

---

[122]*Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (internal quotation omitted).

[123]*Id*. at 1098 (citation omitted).

[124]*Indian Tribal Council of Ariz., Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995) (citations and quotations omitted).

[125]*Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1297-98 (D. N.M. 1996), *aff'd* 104 F.3d 1546 (10th Cir. 1997).

Count II that the Secretary has unlawfully withheld its duty to accept the Park City Land in trust, which are dismissed; Defendants' Cross-Motions are denied with respect to the claim in Count II that the Secretary's actions constitute unreasonable delay.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction over the remaining claim of unreasonable delay raised in Count II in this case until the Secretary issues a final ruling on the Nation's application. The Secretary shall provide the Nation and the Court with quarterly status reports detailing the progress the Department has made in processing the Nation's Park City Land application. The first report shall be due **ninety (90) days** after the date of this Order and shall include a detailed description of all significant actions undertaken processing the Nation's application since the date of this Order; subsequent quarterly reports shall include the progress undertaken since the preceding report. In addition, the Secretary shall provide a schedule of actions expected to be undertaken during the next and subsequent three month period. Upon reasonable request by the Nation or the Court, the Secretary shall provide within thirty (30) days any additional information to explain or supplement its quarterly reports. If the Nation is unable to obtain additional information from the Secretary, it may petition the Court to order the Secretary to provide such information. Finally, at any time prior to the issuance of the final ruling on the pending application, any party may petition this Court for any additional relief as may be warranted.

       **IT IS SO ORDERED.**

Dated: <u>April 10, 2013</u>

                              <u> S/ Julie A. Robinson </u>
                              JULIE A. ROBINSON
                              UNITED STATES DISTRICT JUDGE